## IN THE MATTER OF WILLIAM ROBERTS.

### *Detroit Central Station Police Court.*

The Detroit charter of 1883 repeals all conflicting acts, and gives the
Recorder's Court exclusive jurisdiction of all prosecutions for of-
fences arising under it, or under any ordinance.  All cases thereto-
fore triable in the Central Station police court arose under the
charter; and all breaches of the peace had to be defined by ordinance.
*Held*, that in the absence of any provision for the continuance of the
Central Station court, it was abolished.

Habeas corpus and certiorari.    October 16.—October 23.

*George H. Penniman* for petitioner.

Police Justice *John Miner* and *James Caplis*, Prosecut-
ing Attorney for Wayne County, against.

CAMPBELL, J.   The prisoner is confined in the Detroit
House of Correction under a conviction which purports to
be for conduct regarded by the police justice of Detroit as
a breach of the peace.   As the complaint and facts are not
presented to us, we have no means of knowing whether they
would come within the law or ordinances under which the
conviction was had, and for the purposes of this hearing we
may assume that there is no difficulty on that matter, inas-
much as counsel had treated the case as raising no such
question.   The ground of objection is that Roberts was con-
victed under the same statute construed in *Sarah Way's
Case* 41 Mich. 299, at a session of the police court held at
a police station.   It is claimed that this statute is no longer
in existence.

The Legislature of 1883, instead of inserting amendments
in the city charter of Detroit, the multitude of which has
caused some confusion, enacted an entirely new charter en-
titled " An act to provide a charter for the city of Detroit,
and to repeal all acts and parts of acts in conflict therewith."
This was passed June 7 and made to take effect July 1,
1883.   [Act 326 of 1883.]

The principal contest, so far as any arose, was upon the effect of this charter upon certain sections of the original police law, retained when the present municipal system, known as "the metropolitan police system," was created. Those sections are the same that were considered in *Sarah Way's Case*, being sections 10 to 14, inclusive, of chapter 13 of the charter of 1857 as amended in 1861 and subsequently.

The city and county law officers having declined to appear in sustaining the present efficacy of these sections, the police justice came before us and gave us the aid of his views and experience in regard to the practice pursued, and we have, therefore, been satisfied that the merits are sufficiently presented to enable us to come to a conclusion. To understand the bearing of these various provisions, a brief reference will be necessary to the history of the police court and of the legislation bearing on it.

The police court was first created by "An act to establish a police court in the city of Detroit," approved April 2, 1850. Sess. L. 1850, p. 364. Its general purpose was to place in the hands of one magistrate the entire criminal jurisdiction of justices of the peace arising in the city of Detroit. The only special feature was the requirement that he should reside and keep an office in the city of Detroit, and attend to all complaints of a criminal nature which might be brought before him at all reasonable hours. Sec. 4. Beyond this requisite of constant attendance, his duties and powers were in no way different from those of any other justice in criminal matters, but he could do no civil business as justice. Sec. 8. He was paid out of the county funds, and was attended by the ordinary constables and city marshal.

By section 11 of the schedule of the Constitution of 1850 this court was allowed to retain its powers until otherwise provided by law. At this time the court was attended by the same officers as other justice's courts, and the population was not large enough to require special police arrangements.

In 1857, for the first time, the police justice was allowed

to appoint a clerk, to be paid by the county. Sess. L. 1857, p. 465. In that year the city received a new charter, and its limits were enlarged. A local criminal court superseding the jurisdiction of the circuit courts and known as the Recorder's Court, was also created, so as, with the police court, to deal with every class of crimes committed in Detroit.

In 1861 a police system was created as a part of the city government, the mayor and two persons chosen by the council being commissioners, and their powers being similar to those afterwards vested in the metropolitan police board. This statute it becomes necessary to examine with some care, because the validity of the present prosecution depends on whether it is abrogated or partially in force.

Up to its enactment the police justice and police court cannot be said to have had any connection with the city whatever beyond location. The common council appointed the clerk, and in certain cases might designate a justice of the peace to act provisionally, but the court was supported by the county, and had no duty of any kind to perform in which the city was interested.

By the Legislature of 1861 an Act was passed to amend the charter of 1857, and added a chapter to be known as chapter 13, containing sections numbered 1 to 15, but by some inadvertence section 6 was left out and no change made in the other numbers. By the laws of 1864 certain amendments were made, including one purporting to amend section 6, which probably assumed that the numbers were to be changed so as to make 7 stand as 6, and the remaining sections in like manner. At any rate they made the section which they numbered 6 include the old section 7. But this is the only change effected in that direction, and it is quite likely it came from the habit which seems to have prevailed in printing Acts relating to the city by the city officers, of attempting to correct supposed legislative mistakes, whereby a good deal of difficulty has arisen in using city publications. The amendment of 1864 was no doubt

drawn by some city functionary, and this error in numbering and renumbering has led to misapprehension.

The new chapter 13 was devoted entirely to securing to the city authorities the entire control of police affairs, taking them to a large extent away from the ancient common-law officers. Except as enlarging· the jurisdiction of the city authorities the chapter had no important significance. That chapter provided for the organization of a board of police commissioners, the mayor being one, who were to have general charge of the appointment and discipline of a police force, with a chief nominated by the board and confirmed by the council. This chief was to have all of the power of the police justice in receiving complaints and issuing warrants for crimes, but they were to be returnable before the police justice at his office. § 4. This provision is significant in bearing upon the remaining sections which, without it, are obscure. It recognizes, as the Police Court Act did, the office of the police justice as the place where he was usually expected and required to be found, and to perform his functions as such.

Section 10, which the city compilers seemed to have regarded as section 9, (but by what authority we do not comprehend), is the key to the subsequent sections now under consideration. It provided that under proper regulations to be framed by the department, the police officers might arrest without warrant persons violating city ordinances relative to breaches of the peace, and take them before the chief of police and make complaint, and that officer was empowered to bail or commit them to appear before the police or Recorder's Court. As no misdemeanors except breaches of the peace can lawfully be made the subject of arrest without process, this section gave no new powers, but confined the power to a limited class of breaches of the peace, which came within some grant of power to the city as of municipal as well as public importance. Following this was section 11, which gave the police justice jurisdiction of such ordinance offenses as the common council should prescribe, and directed the penalties to be paid into the city treasury. The Record-

er's Court was the place where ordinance cases were usually triable. This enabled the council to use the police court also.

Section 5 had required the board to "provide suitable accommodations for the police, to be designated '*the police station.*'" It will be observed that the power of the police court to try ordinance cases generally, remained without special designation of locality and was presumably to be exercised where the court sat. Thus far, except as to the power of the chief of police to bind over and commit offenders, there is nothing which does not immediately concern the city and offenses against its ordinances.

Section 12, which next demands attention was, until in 1868, after the new Police Act had been in force some years, supposed to relate purely to city ordinance cases, and the city authorities had collected and kept the moneys paid for fines under it. In that year we held in two cases ( *Wayne . County v. City of Detroit* 17 Mich. 390, and the *People v. Controller of Detroit* 18 Mich. 445) that the specifically named offenses were purely State offenses, and the various breaches of the peace mentioned in city ordinances were not treated in that section as ordinance breaches, but only as a limited class of criminal breaches of the peace. See also *Fennell v. Common Council of Bay City* 36 Mich. 186, where the distinction is further explained.

This section requires the police justice to attend at the "*police station-house*" at such times as should be required by the common council, to "summarily examine into the case of every person confined in said station-house " and in cases of vagrancy, disorderly conduct and violations of the city ordinances concerning breaches of the peace, to inflict a specified punishment. It was the fact that the punishment was fixed by this law and not by the ordinances, that in the opinion of this Court required the cases of breaches of the peace to be dealt with as crimes and not violations of ordinance, while no reference was made at all to ordinances concerning vagrancy and disorderly conduct. The same section required him to reserve all other cases for examination

before the *police court*, recognizing it as a distinct institution. Moreover, by the same section it was provided that all of these station-house duties might be imposed on a separate justice to be designated by the common council, and in such case the police justice could only act in case of his disability. Compensation for these station-house services was to be made by the city, while the police court expenses belonged to the county.

It is impossible to read this chapter without seeing that it was designed to subserve what were supposed to be merely city purposes, all others being merely incidental. And until the dispute arose on the ownership of the fines, the city authorities and the police justice acted on the theory that it was a matter under the ordinances entirely.

In 1865 a law was passed "to establish a police government for the city of Detroit." Sess. L. 1865, p. 99. This put the whole police management of the city under a State board, and left the common council no further control over it, except in relation to ordinance matters, and the police were substituted for the municipal officers as to those. This statute did not re-enact or perpetuate any portion of the charter, but expressly abrogated sections 1 to 9 of the Act of 1861 as partly amended in 1864. Nothing was said as to the remaining sections, which therefore continued to form a part of the city charter so far as not affected by repugnant provisions. It is not important now to consider these questions of repugnancy as necessarily affecting the present inquiry. But it may not be useless to examine the changes with reference to the true character of the original Act.

In repealing the nine sections of 1861 that section was repealed which referred to the "police station" as required to be so established and named. The new board was required to divide the city into precincts and assign captains and sergeants to each precinct, and from time to time to establish stations or sub-stations in these precincts. Sec. 15. It was also required that arrested persons should only be detained in places provided for that purpose. And it was expressly required that *no trial or examination of any persons arrested*

*should be held in the office of the Superintendent of the Po-*
*lice or of the board.* Ib. Sec. 20.

Comparing these provisions with sections 10, 11 and 12
before referred to, it is manifest that as soon as the necessi-
ties for accommodation should become extended, so as to
include more than one station-house, difficulty would at once
arise concerning the attendance of the magistrate. The law
of 1861 contemplated one locality as police headquarters, and
summary examinations at that into cases of detention. The
new law contemplates a separation of stations, and contains
no directions for visiting them all, nor means for supply-
ing either enough justices to visit them all, or relief to the
police court itself during the absences at such stations, which,
if all visited, would occupy much time, as the city is exten-
sive, and it is designed the stations shall also be scattered.
The practical inconsistencies between the two statutes are
very considerable, but have been felt in their effects while
not much noticed in their bearings. It appears that the po-
lice justice has been in the habit of holding morning sessions
at the old central station. But it has already been pointed
out that the law of 1861 did not require this duty to be ex-
ercised by him except in the failure of any other appoint-
ment, and that such appointment was among the powers of
the common council, as well as was the power to require
such visitations at all. Such powers were therefore appro-
priate to a city charter. And inasmuch as the repeal of the
earlier sections of the chapter 13 of 1861 has taken out of
it all except that which depended on the action of the com-
mon council, there is still more reason for regarding the
subject as municipal.

It is under this state of things that we are called on to
assume that the charter of 1883 is to be regarded as not af-
fecting these residuary sections of 1861. This charter is
entitled "An act to provide a charter for the city of Detroit,
and to repeal all acts and parts of acts in conflict therewith."
It does not purport to be partial or supplementary, but to be
the only charter. There can be no doubt of this purpose,
and there can be no doubt that, without very manifest obli-

gation, it cannot be admissible to select out of older charters matters omitted in this as still in force. If this could be done on one subject no one can see where the process would stop. There are many omitted provisions which no one would consider repugnant. We must assume that things omitted are designedly omitted. If we should go into conjectures concerning what the Legislature would probably have preserved expressly had their attention been called to it, we should be merely guessing, and undertaking judicially to mend legislation.

We have already referred to the manifest purpose of the sections in question to refer to city matters and subject the business of the station court to the discretion of the council, both as to times and occasions, and as to the magistrate to hold it. But the new charter has not left all of these sections untouched by express enactment. By chapter 12, section 22, the Recorder's Court is given exclusive jurisdiction of all prosecutions for offenses arising under that charter, or any ordinance or regulation of the common council. Every one of the station-house cases must arise under the charter and all breaches of the peace be defined by the ordinances. The old charter is certainly defunct for all purposes of passing ordinances, and if prosecutions are had under the old chapter 13, it would be difficult to say that it has any separate existence from the rest of the charter of which it formed a part. But the difficulty goes further. Section 11, which gave the police justice jurisdiction over ordinance cases, is repugnant to the new provisions giving exclusive jurisdiction to the Recorder. There are further incongruities between the provisions of 1861 and the present charter and the present police system, which would render it very difficult to say what is repugnant and what is not.

The only safe conclusion is the natural one—that the charter of 1883 has abrogated all of the charter of 1857 and its amendments which are not re-enacted in this or preserved in some other legislation. The purposes of the sections in controversy, although having some further indirect bear-

ings, were not foreign to the old charter, and they cannot now be distinguished.

We are not called on to devise remedies which belong to the Legislature. There are probably some inconveniences from lack of sufficient magisterial officers. There may be some difference of opinion concerning the policy of holding the station court. That is not for us to determine. It is plain, however, that a system which throws the entire labor and responsibility of criminal examinations and the trial of a large class of crimes upon one man, is unfit to provide for the necessities of a large city. The whole system was designed and shaped when one man could do it all adequately. But it is impossible now to live under such a state of things without deficiencies and troubles which are chiefly due to the law itself. From the facts appearing in *Way's Case* and others which we have had to deal with, we do not believe that the necessity of having arrests and complaints disposed of publicly, at a court likely to be habitually attended by others than the police force and the persons under arrest, will lead to any evil consequences. No doubt the deficiencies of the present laws will lead to some amendment, if not to radical changes. The subject is one requiring knowledge and good judgment, which it may be hoped will devise remedies.

We think the conviction was unlawful and the prisoner must be discharged.

The other Justices concurred.